515 A.2d 33

## In re ADOPTION OF K.L.R.F.

### Appeal of Victoria Red Fox WOODS, Natural Mother.

Superior Court of Pennsylvania.

Argued Jan. 30, 1986.

Filed Sept. 8, 1986.

Petition for Allowance of Appeal Granted Feb. 24, 1987.

James P. O'Connell, Aliquippa, for appellant.

Before CIRILLO, President Judge, and DEL SOLE and BECK, JJ.

CIRILLO, President Judge:

This is an appeal from an order terminating the parental rights of appellant. Appellant is an American Indian. The child involved is also an American Indian. Appellant was the adoptive parent of the child until the hearing court terminated her parental rights. This case is governed by the Federal Indian Child Welfare Act of 1978 (hereinafter "the Act") and is one of first impression in this state. After careful review of the record in this case and an analysis of the governing federal statute, we agree with appellant that reversal is required.

The Act was designed to promote a two-fold national policy: the protection of the best interests of Indian children, and the promotion of stable and secure Indian tribal entities. 25 U.S.C.A. § 1902. The Act establishes minimum federal standards applicable to child custody proceedings in order to prevent the separation of Indian children from family and tribal heritage. As noted by one of the few courts faced with the task of interpreting the provisions of the Act:

> Hearings conducted in 1974 before the Senate Committee on Indian Affairs revealed a pattern of discrimination against American Indians in child welfare and child custody. Testimony indicated that for decades officials had removed a disproportionately large number of Indian children from their homes and reservations, and had placed them in non-Indian homes and that many of the removals were unwarranted because officials showed too little deference to Indian cultural norms and denied due process in child custody proceedings. These practices deprived many children of their tribal and cultural heritage.
>
> To reverse this erosion of Indian family life, Congress enacted the Act. *See* H.R.Rep. No. 1386, 95th Cong., 2d Sess. 8, reprinted in [1978] U.S.Code Cong. & Ad.News 7530.

*Matter of Appeal in Pima County Juvenile Action No. S–903*, 130 Ariz. 202, 635 P.2d 187 (App.1981).

The Act is based on the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected. *Pima, supra; see also Indian Child Welfare Act of 1978: Provisions and Policy,* 25 S.O.L.Rev. 98 *et seq.* (1980).

The Act defines certain procedures to be followed in state court proceedings involving Indian children and, as discussed below, provides a mechanism whereby an Indian parent may withdraw his or her consent to a foster care placement and effect a return of the Indian child.[1] Appellant contends that this statutory mechanism was ignored or misapplied in the instant case and challenges the hearing court's construction of that portion of the Act.[2] As a corollary, appellant urges that the spirit and intent of the Act were ignored. Appellant also contends that the trial

1. 25 U.S.C.A. § 1913(b) reads:
   **(b) Foster care placement; withdrawal of consent**
   Any parent or Indian custodian may withdraw consent to a foster care placement under State law at any time and, upon such withdrawal, the child shall be returned to the parent or Indian custodian.

2. Appellant also raises several other issues, which, in light of our disposition of this issue, are moot and need not be addressed specifically. The issues which we do not address are: (1) whether the hearing court ignored the mandate of 25 U.S.C.A. § 1911(b) by refusing to transfer the proceedings to the tribal court; (2) whether the hearing court ignored 25 U.S.C.A. § 1912(d) by not requiring a showing that appellees took steps to prevent the breakup of the Indian family; (3) whether the hearing court ignored 25 U.S.C.A. § 1912(f) by not requiring the appellees to produce qualified expert witnesses who proved, beyond a reasonable doubt, that serious emotional or physical harm would be done to the child if it was forced to live apart from its tribe; (4) whether appellant's conduct evidenced a settled purpose of relinquishing her parental claim pursuant to 23 Pa.C.S.A. § 2511(a)(1); and (5) whether 25 U.S.C.A. § 1913(c) affords a basis for appellant's withdrawal of consent. Although these issues are rendered moot by our holding herein, we note the following for purposes of allocatur. Had our disposition of appellant's 25 U.S.C.A. § 1913 issue been in favor of appellee instead of appellant, we would have upheld the hearing court's disposition of all other issues raised and affirmed the order in question on the basis of the hearing court's scholarly opinion. We part company with the trial court solely on the basis of its disposition of the issue specifically addressed herein.

court erred in denying petitions to transfer the case to the tribal court pursuant to 25 U.S.C.A. § 1911(b) [3].

The facts of this case are extremely complex. They may be summarized as follows. Appellee is a Caucasian residing in Beaver County, Pennsylvania, along with the Indian child who is the subject of this action, another Indian child whom she has adopted, and a Caucasian adopted child. Appellant was, until the hearing court terminated her parental rights, the adoptive Indian parent of the child. Appellant and the child are both enrolled as members in the Cheyenne River Sioux Tribe whose reservation is located in South Dakota. The child was born on the reservation in 1979.

Appellee's first contact with appellant was in 1980 when an Indian child was placed with appellee for purposes of adoption. This adoption was finalized in 1981. Prior to that time appellant contacted appellee to ask her to adopt a second child, who is the subject of the present action. Appellee obtained custody of the child on November 17, 1981, at which time appellant provided her with a written notice that appellant was to have "temporary and complete custody" of the child.

In March, 1982, appellee filed an adoption petition in the Cheyenne River Sioux Tribal Court in South Dakota for the adoption of the child. This petition was withdrawn at the request of appellant. In May, 1982, and again in August, 1982, appellant informed appellee that she wanted appellee to adopt the child. In the fall of 1982, appellee's attorney mailed consent forms to appellant and the adoptive Indian father of the child. The adoptive Indian father is not a party to this appeal. The father indicated that he would not consent to the adoption. Appellant and the adoptive Indian father were either divorced or separated at this time.

**3.** The concurrence would hold that the hearing court erred in refusing to transfer the case to the tribal court. We recognize that the hearing court apparently failed to consider the most recently promulgated guidelines published at 44 Fed.Reg. 67584, 67591 (1979). However, as noted by the concurrence, the guidelines are not binding upon the trial court in its determination of whether "good cause" not to transfer exists. Therefore, under the circumstances present at the time of the petitions, we feel that the court did not abuse its discretion in refusing to transfer the case.

In November, 1982, appellant wrote to appellee stating that she might have to ask that the child be returned, but did not request a return at that time. During November, 1982, appellant indicated to appellee in writing and in a telephone conversation that the reason for her abruptly altered desire with regard to the adoption was that she feared that the adoptive Indian father might obtain custody of the child.

Between November, 1982 and March, 1983, appellant informed appellee on three different occasions that she was planning to come to Pennsylvania to retrieve the child. Each time, she changed her mind and did not make the trip. In February, 1983, appellant indicated in a letter that she still had not decided whether to take the child back. In March, 1983, appellant again stated that she planned to come to Pennsylvania but when asked by appellee's husband whether she intended to take the child, she responded that she wished to talk with him.

The court found "no direct proof" that appellant traveled to Pittsburgh to claim the child in March, 1983. As stated by the court in a footnote to its opinion:

Although counsel for Respondent states in his brief at p. 2 that V.R.F.W. did travel to Pennsylvania in March, 1983, to get her daughter, we do not believe the evidence is so clear. The only testimony in this regard is that of D.A.E. also stated that it was her opinion that if V.R.F.W. did come to Pittsburgh, she did not leave the airport or call the E.'s attorney; she did leave a message at the E.'s home stating that she was in Pittsburgh. Thus, there is not any direct proof that V.R.F.W. was in Pennsylvania and one can only surmise as to her reason for coming if she did come.

On March 17, appellee and her husband filed an involuntary termination petition in Pennsylvania. On April 12, 1983, appellant executed a revocation of the temporary guardianship. This information was conveyed to appellee's counsel by letter dated April 18, 1983. On April 19, 1983, appellant filed a petition to transfer the proceedings to the

Tribal court. This petition was denied by the Pennsylvania court. Hearings were held on the involuntary termination petition and appellant's parental rights were terminated by the order of September 11, 1984. Appellant took no part in the termination proceedings although she was represented by counsel.

■ We begin our analysis by noting that appellant does have standing to rely upon and demand compliance with the provisions of the Act. "Parent" is defined in § 1903(9) as:

[A]ny biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include the unwed father where paternity has not been acknowledged or established.

By the statute's definition of "parent", appellant, although not the natural parent of the Indian child, is the adoptive parent of the child, and as such qualifies as a parent entitled to seek the protections afforded by the Act.

■ We turn next to appellant's contention that the hearing court ignored or misconstrued certain provisions of the Act which require the return of an Indian child to its parents upon the parents' withdrawal of consent to a foster care placement. Section 1913(b) provides that:

Any parent or Indian custodian may withdraw consent to a foster care placement under State law at any time and, upon such withdrawal, the child shall be returned to the parent or Indian custodian.

Section 1903(1)(i) defines "foster care placement" as:

[A]ny action removing an Indian child from its parent or Indian custodian for *temporary placement* in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian *cannot* have the child returned upon demand, but where parental rights have not been terminated.

(Emphasis added). Appellant executed a revocation of the custodial arrangement on April 12, 1983. This information was conveyed to counsel for appellant on April 18, 1983. In

holding that § 1913(b) was inapplicable to the facts of the instant case the hearing court stated:

> We cannot help but notice that these two provisions are contradictory; one provides that consent can be withdrawn at any time with regard to a foster care placement; and the other just as explicitly states that in a foster care placement, the parent or Indian custodian cannot have the child returned upon demand. We need not resolve this inconsistency in the case before us. However, we note that if § 1903 is in fact what the legislature intended the definition of "foster care placement" to be, then § 1913(b) can be given no effect because a foster care placement by definition precludes the possibility of a parent being entitled to the return of the child upon demand. If § 1903 is construed to be erroneous with regard to the parent's ability to demand return of the child and § 1913(b) is construed to be a valid provision, § 1913 still would not apply to the instant case because the placement which was made was intended to be permanent; adoption was the ultimate objective. Section 1913(b) applies only to temporary placements.

We construe § 1913(b) as applying to situations such as the instant case, wherein a *consensual* foster care placement was made in the first place and there is no inherent bar to a withdrawal of the consent. In so doing, we are guided by the presumption that the drafters of the statute did not intend a result that is absurd or impossible of execution, *McKinney v. Board of Commissioners of Allegheny County*, 488 Pa. 86, 410 A.2d 1238 (1980); and the presumption that the drafters did intend the entire statute to be effective and certain. *In re Borough of Lemoyne*, 176 Pa.Super. 38, 107 A.2d 149 (1954). Further, statutes enacted to benefit American Indians must be liberally construed with all doubts resolved in favor of the Indian seeking its benefits or protections. *Preston v. Heckler*, 734 F.2d 1359 (9th Cir.1984); *Bryan v. Itasca Co., Minnesota*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). With these principles in mind, we cannot conclude that the draft-

ers of the Act intended § 1903(1)(i) and § 1913(b) to interact in such a way as to nullify the withdrawal of consent provision in § 1913(b). Therefore, we hold that the definitional language in § 1903(1)(i) has no effect upon an Indian parent's ability to demand a return of the child pursuant to § 1913(b).

We agree with the hearing court that the right to withdraw consent pursuant to § 1913(b) exists only in temporary placement situations. However, we do not agree with that court's conclusion that the placement in the instant case was permanent simply because adoption may have been, at one time, the "ultimate objective" of the parties. If parental rights have not been terminated, settled Pennsylvania case law establishes that consent to adoption may be withdrawn at any time before the entry of the final decree of adoption. *In re Adoption of R.W.B.*, 485 Pa. 168, 401 A.2d 347 (1979). *See also Commonwealth ex rel. Grimes v. Yack*, 289 Pa.Super. 495, 433 A.2d 1363 (1981). Therefore, a purely consensual placement is, by necessary implication, merely temporary for the purposes of § 1913(b) until such time as a final decree fixing parental rights and awarding permanent custody is entered.

The facts of this case support our holding that the placement was merely temporary. The hearing court specifically found that appellant, on or about November 17, 1981 "... provided [appellee] with a written notice that [appellees] would have *temporary* and complete custody of K.L.R.F." (Emphasis added). The hearing court also found as a fact, that it was appellees' understanding, based upon conversations with appellant, that the custodial arrangement was to be "temporary" only from the standpoint that upon completion of the adoption proceeding, appellees' custody would be permanent. This, however, does not change the temporary status of the placement for the purpose of applying § 1913(b) because of the ever present risk that appellant might change her mind at any time and withdraw her consent to the custodial placement, the adoption, or both. Indeed, even if the initial arrangement could

be considered "permanent", and thereby not subject to the mandate of § 1913(b), any such permanence ended during the period between November, 1982 and March, 1983. The hearing court found that during this period appellant informed appellees by letter of her "... abruptly altered desire with regards to the adoption" and also that appellant stated, on three occasions, that she was planning to travel to Pennsylvania to retrieve the child. Obviously, the custodial situation changed rapidly from one of relative stability to one which, at best, was tenuous and temporary during the five months preceding appellees' involuntary termination action. Adoption was no longer appellant's ultimate objective.

We hold that § 1913(b) applies to the case herein and, accordingly, that appellant had the right and ability to withdraw her consent to the placement and to effect an immediate return of the child. In so doing, we are mindful of the fact that K.L.R.F. will be uprooted from her home and familiar surroundings. This makes our task all the more difficult. However, the mandate of § 1913(b) is clear, as are the principles and policies underlying the Act itself. The overriding concern of Congress was the maintenance of the family and tribal relationships existing in Indian homes. *Matter of Adoption of Baby Boy L.*, 231 Kan. 199, 643 P.2d 168 (1982). The Act is based upon the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected. *Matter of Appeal in Pima County Juvenile Action No. S–903*, 130 Ariz. 202, 635 P.2d 187 (App.1981). The Act unquestionably provides a higher standard of protection to the rights of Indian parents in termination proceedings. *Pima, supra; E.A. v. State*, 623 P.2d 1210 (Alas.1981). To promote the purposes of the Act, Congress saw fit to include § 1913(b), which clearly allows Indians to withdraw their consent to a preadoptive or foster placement. This is exactly what appellant did. As stated by the Court in *Pima, supra* in construing § 1913(c) which grants a similar right of withdrawal:

When an Indian child within the purview of the Act is involved, adoption agencies and prospective adoptive parents must be held to assume the risk that a parent such as appellant might change her mind before the adoption is finalized.

*Id.* 130 Ariz. 202 at 208, 635 P.2d 187 at 192.

The order terminating appellant's parental rights is set aside. The case is remanded to the hearing court with instructions to enter an appropriate order directing appellee to return appellant's child to appellant.

DEL SOLE, J., files a concurring opinion.

BECK, J., dissents.

DEL SOLE, Judge, concurring:

I agree with the majority that the custodial arrangement under the facts of this case was temporary for the purposes of applying § 1913(b) and therefore Appellant had the right to withdraw her consent to the placement. The order terminating Appellant's parental rights must therefore be set aside.

I believe, however, that the refusal of the hearing court to transfer the proceedings to the tribal court pursuant to 25 U.S.C.A. § 1911(b) merits discussion.

Appellant, and subsequently the Cheyenne River Sioux Tribal Court sought transfer of these proceedings to the Tribal Court based on the Indian Child Welfare Act (ICWA) 25 U.S.C.A. § 1901 et seq. The Act states in pertinent part:

Transfer of proceedings; declination by tribal court. In any State court proceeding for ... termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe

... upon the petition of either parent or the Indian child's tribe....

25 U.S.C.A. § 1911(b).

On January 9, 1984, the trial court denied the Appellant's application for transfer of the proceedings finding good cause to deny transfer and on September 11, 1984, the application of the tribe for transfer was denied for the reasons set forth in the January 9, 1984 order.

I agree with the trial court that what constitutes "good cause to the contrary" has not been definitively established and I have located no Pennsylvania case law interpreting the ICWA. However, other jurisdictions and authority have considered the term. The Arizona Court of Appeals in *Matter of Appeal in Pima County*, 130 Ariz. 202, 635 P.2d 187 (App.1981) found the trial court should have deferred to tribal jurisdiction as:

> Evidence concerning the mother's fitness as a parent would be more readily available in Montana. Qualified expert witnesses as to whether custody in the mother would likely result in serious emotional or physical damage to the child would also be more accessible as expert witnesses lacking knowledge of the tribal culture and values may not be "qualified" to give an opinion.

*Id.* at 207, 635 P.2d at 192.

The court further indicated that:

> Accessibility to proof would seem to be the principal factor on which state courts could rely to retain jurisdiction. Indian Child Welfare: A Jurisdictional Approach, 21 Ariz.L.Rev. 1123, 1143 (1979). The author points out: (1) If the tribe desires that the case be heard by the tribal court, distance from the reservation in and of itself would not be sufficient "good cause" for the state court to refuse to transfer the proceedings despite the expense, and (2) in most instances an Indian parent will call witnesses residing on the reservation to rebut evidence as to parental unfitness and the state court must make a

determination as to which party is most able to bear the expense of producing witnesses in distant courts. The only justification for retention of jurisdiction in Arizona is the presence of the child and the prospective adoptive parents. However, the issue in these termination proceedings is not the fitness of the adoptive parents but rather the unfitness of the parent whose relationship is sought to be severed.

*Id.* at 206–07, 635 P.2d at 191–192.

*But cf. In Interest of J.R.H.*, 358 N.W.2d 311 (Iowa 1984) (good cause to deny transfer may arise from geographical obstacles).

In the case sub judice the trial court indicated:

Additional help in ascertaining the factors to be included in considering "good cause to the contrary" can be found in 44 Fed.Reg. 24000, 42001 R.G. (i) (1979). Therein, it was stated that good cause would include, but not be limited to the following elements:

1. Whether or not the child's biological parents were unavailable;

2. Whether or not an Indian custodian has been appointed;

3. How much contact the child has had with the tribe for a significant period of time;

4. Whether or not the child has resided on the reservation for a significant period of time;

5. If the child is over 12 years old, whether he or she has indicated an opposition to the transfer.

(Trial Court Opinion at 9).

Applying these guidelines:

in addition to the fact that there is credible testimony that if the child or the Respondent were to have to travel to South Dakota, the child's physical and mental health would most likely be seriously impaired, and also considering that the child has had very little conscious associa-

tion with the tribe and the Indian family during her life, we find there is good cause to retain jurisdiction.... (Trial Court Opinion at 10).

I believe the trial court erred in applying the above listed factors. Those factors constitute an early form of guidelines published by the Secretary of the Interior.

All five criteria that were listed in the earlier version of the guidelines were highly controversial. Comments on the first two criteria were almost unanimously negative.... These criteria were criticized as irrelevant and arbitrary.... Although there was some support for the third and fourth criteria, the preponderance of the comment concerning them was critical....

It is recommended that in most cases state court judges not be called upon to determined (sic) whether or not a child's contacts with a reservation are so limited that a case should not be transferred.

Guidelines for State Courts: Indian Child Custody Proceedings, C. 3. Commentary, 44 Fed.Reg. 67584, 67591 (1979).

The revised Guidelines state:

Determination of Good Cause to the Contrary

(a) Good cause not to transfer the proceeding exists if the Indian child's tribe does not have a tribal court....

(b) Good cause not to transfer the proceeding may exist if any of the following circumstances exists:

(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.

(ii) The Indian child is over twelve years of age and objects to the transfer.

(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.

(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe.

(c) Socio-economic conditions and the perceived adequacy of tribal or Bureau of Indian Affairs social services or judicial systems may not be considered in a determination that good cause exists.

(d) The burden of establishing good cause to the contrary shall be on the party opposing the transfer.

Guidelines for State Courts; Indian Child Custody Proceedings, C. 3 Determination of Good Cause to the Contrary, 44 Fed.Reg. 67584, 67591 (1979).[1]

Applying the revised Guidelines to the present case, it is uncontroverted that the tribe has a tribal court; that the proceeding was not at an advanced stage when the petition to transfer was received; the child was under five years of age. Although the child may have had little contact with the tribe, the commentary to the Guidelines, previously mentioned, recommends against state court judges basing a transfer request on a child's limited tribal contact. The determinative factor under the guidelines therefore would be whether the evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses. The trial court indicated that many persons who would be called as witnesses would be from Pennsylvania. However, I agree with the Arizona Court of Appeals that, "the issue in these termination proceedings is not the fitness of the adoptive parents but rather the unfitness of the parents whose relationship is sought to be severed." *Matter of Appeal in Pima County, supra,* 130 Ariz. at 207, 635 P.2d at 192. Evidence concerning the parent's fitness is the relevant inquiry. Transfer of this case to the Tribe pursuant to 25 U.S.C.A. § 1911(b) would have been in my judgment in keeping with the declared policy of Congress "to protect the best interests of Indian children and to promote stability and security of Indian tribes and families . . ." 25 U.S.C.A.

---

**1.** Although the Guidelines are not published as regulations and therefore have no binding legislative effect on this court, I find the Department of the Interior's interpretation of the term "good cause" to be beneficial in considering this matter.

§ 1902. Failure of the hearing court to transfer the proceedings was an abuse of discretion.